### JENSON et al. v. WARD et al.

No. 23828. Feb. 26, 1935.

Rehearing Denied April 2, 1935.

Charles L. Yancey, G. C. Spillers, Donald L. Brown, E. M. Calkin, and W. A. Chase, for plaintiffs in error.

Thomas J. Horsely and Ed L. Jones, for defendants in error.

PER CURIAM. J. D. Ward instituted this action in the district court of Tulsa county, Okla., on the 1st day of September, 1922, as plaintiff, against Henry A. Jenson, H. A. Jenson, Charles F. Runyan, J. W. Myers, and Gladys Stebbins. On motion of the defendant H. A. Jenson, the defendants O. K. Eysenbach, D. A. Skillen and J. E. Gentry were made defendants.

Gladys Stebbins files her answer as Gladys McClintock alleging certain facts and disclaiming any interest in the property described in the plaintiff's petition. The defendants and J. W. Myers, D. A. Skillen, and J. E. Gentry disclaim any interest in the property, and thereafter it was brought to the attention of the court that J. D. Ward had died and the cause was revived in the name of Sallie B. Ward and Sallie B. Ward as administratrix of the estate of J. D. Ward, deceased.

The parties will be referred to for convenience as they appeared in the court below; that is, Sallie Ward, defendant in error, will be referred to as plaintiff, and H. A. Jenson and Bessie C. Eysenbach, administratrix of the estate of O. K. Eysenbach, deceased, plaintiffs in error, will be referred to as defendants.

In the course of the trial the evidence substantially follows the allegations contained in the pleadings. The evidence of the plaintiff showed that the land described in the plaintiff's petition, to wit, the southeast quarter of the southeast quarter of section 35, township 19 north and range 12 east of the Indian Base and Meridian, was allotted to Riley Fulsom, who was a freedman citizen of the Creek Nation of the Indians, and that this was set aside by the Creek Nation to the said Riley Fulsom as his homestead allotment and homestead patent issued therefor. That Riley Fulsom had two names; he went by the name of Harry Fulsom and Riley Fulsom and the land was patented to him as Riley Fulsom. That the 40 acres of land above described was wild, unimproved lands; that the allottee of said land was imprisoned at Ft. Smith, Ark., under the name of Harry Fulsom, convicted by the district court of Sebastian county, Ark., and sent to the Arkansas Penitentiary at Little Rock; that the allottee died in the penitentiary at Little Rock on the 22nd day of February, 1908, as Harry Fulsom. No question, however, was raised as to the variance in name, it being conceded by all parties to the action that the party who died in the penitentiary was the allottee mentioned in the patent introduced in the evidence. The allottee, Riley Fulsom, left no wife or issue, and title to the lands described in the plaintiff's petition on the death of the said Riley Fulsom passed to his father, Lewis Fulsom, and the various brothers and sisters, as alleged in the plaintiff's petition.

On August 21, 1908, Lewis Fulsom and David R. Fulsom executed a deed to the plaintiff, J. D. Ward, for their interest in the lands above described, and on August 21st Lewis Fulsom, Jr., executed a deed for his interest in the land. On October 7, 1908, Elzora Lewis executed a deed to the plaintiff for her interest in the land, and on the 16th day of January, 1911, Thomas Fulsom executed a deed to the plaintiff for his interest in the land above described. On May 25, 1912, the plaintiff deeded the land described in plaintiff's petition to C. E. Brown and E. R. Brown. On the 21st

day of November, 1913, E. R. Brown and C. E. Brown conveyed the land described in plaintiff's petition back to the plaintiff.

The testimony of the plaintiff shows that he went out and looked at the land some time before he bought it and some time after he bought it; that there were no improvements whatever on the land; that the plaintiff gave an oil and gas lease on this land to a man by the name of Noble on the 20th day of July, 1911. The plaintiff testifies that there were no improvements on the land at the time this oil lease was given. There is no further evidence to show that the plaintiff ever went into possession of the land or put any improvements on it. There is some testimony as to the plaintiff leasing the land, but never showed whether the man he leased it to ever went into possession or not. On August 4, 1908, a deed was taken from Riley Fulsom to D. A. Skillen and J. E. Gentry. It was afterwards shown that this deed was executed by Thomas Fulsom and that same was a forgery, and that Riley Fulsom was dead at the time said deed was taken.

The evidence on the part of the defendant shows that Eysenbach got a deed from Skillen and Gentry to the land dated August 15, 1908, and that Eysenbach immediately went into possession of the land by renting the land to a man by the name of L. R. Cummins for grazing purposes, and that Cummins put a wire fence on two sides of the land and fenced it in with other acreage which he was using for grazing purposes; that Eysenbach and his grantee continued in uninterrupted possession of the land until at the time this suit was brought.

There is some evidence to show that Noble drilled a well on this land in 1912 or the latter part of 1911, and that Eysenbach never occupied the land after that time for grazing purposes or for agricultural purposes and never lived on the land.

Evidence further shows that Eysenbach made an oil and gas lease to Noble, who took the lease also from the plaintiff, and that the defendant H. A. Jenson went into possession of the land under Noble as pumper first, and that he occupied part of the land for grazing purposes but never lived on the land, and afterwards purchased Eysenbach's interest in the surface and later purchased his mineral rights, and that H. A. Jenson was in possession of the land at the time this suit was brought. The plaintiff never received any rents or profits from the land except the consideration of the oil and gas lease above referred to, which was $250. He never demanded any rents from any one or possession from any one, and that Eysenbach and his grantees had collected the rents, profits, and royalties accruing from said land up until this suit was brought.

The defendants in their petition in error set out several reasons why the judgment of the lower court should be reversed and a new trial granted, but in their brief the grounds are consolidated and they argue one proposition of law which is as follows:

"A conveyance of real property in the adverse possession of another, where the grantor has not been in possession within a year and has not within that time taken the rents and profits, is void as against the person in possession."

The defendant opens his argument on that question by saying:

"The facts out of which this appeal arises are not disputed. For the purpose of this argument we shall admit that the deed upon which the defendants base their title was a forgery."

It must also be admitted by the plaintiff that he was never in possession and that the defendants were in possession on the date that plaintiff obtained his deed to the property from the allottee's heirs. The defendant asks that his case be reversed on account of the provision of section 1940 of the Statutes of Oklahoma, 1931, which provides:

"Any person who buys or sells, or in any manner procures or makes or takes any promise or covenant to convey any pretended right or title to any lands or tenements unless the grantor thereof or the person making such promise or covenant has been in possession, or he and those by whom he claims have been in possession of the same or of the reversion and remainder thereof or have taken the rents and profits thereof for the space of one year before such grant, conveyance, sale, promise or covenant made, is guilty of a misdemeanor, provided, however, that the provisions of this section shall not be construed to be a restriction or limitation upon the sale of Indian lands by the allottees or the heirs of such allottees of their inherited interest in said land."

There was a great deal of testimony submitted by all the parties to this action as to the possession of the land in question. We think that, under the statement of the

defendants' case and the statute above referred to, this case can be decided on the theory advanced by the plaintiff's brief; that is, that the possession of the legal owner of land, although no improvements be located thereon, is presumed to be in the legal owner until otherwise proven. The record is silent as to the possession of the land in question previous to the 15th day of August, 1908. Under paragraph 56 on page 781 of 50 C. J., the text-writer gives this general principle of law:

"Generally, possession is deemed to follow ownership of the legal title and in the absence of actual possession of land or personalty in any one else, the possession follows the legal title and the holder thereof is deemed to be in constructive possession."

This statement of the law is affirmed by the many citations shown in that volume from the courts of Alabama, Kentucky, Michigan, North Carolina, Arkansas, Oregon, Tennessee, Texas, and Louisiana; also affirmed by this court in the case of the State v. Underwood, 17 Okla. Cr. 443, 190 P. 281.

The evidence shows that the first claim of actual possession of this property was made by Eysenbach shortly after the 15th of August, 1908. The plaintiff, J. D. Ward, took his deed from Lewis Fulsom et al. on the 21st day of August, 1908, and stated that after he took his deed he went out, looked the land over, and there was no fence on the land; that he never saw any fence or opened any gate to get to the land. We think that the burden of proof under the pleadings and statement of facts was on the defendant to show that they were in his possession when Ward took his deed. Eysenbach said that he lived in Tulsa, and that he never took actual possession of the land himself, but rented it to a man by the name of Cummins; that Cummins went out and fenced the land on two sides. Ward said that there was no fence there when he went and looked the land over after he had bought it. Ward's testimony is worth as much in showing possession as Eysenbach's, and we believe that the defendant has failed to sustain the burden of proof in showing that the defendant's grantee, Eysenbach, was in actual possession of the land on August 21, 1908, when the plaintiff took his deed.

The plaintiff presents in his brief the argument that the champerty statute does not apply to this case for the reason that the plaintiff took his deed from the heirs of an Indian allottee. It is admitted by the defendant that the deed under which the defendants held the land was a forgery and void, and there is no dispute as to the plaintiff's title to the land, and for that reason it is admitted that the plaintiff had legal title to the land at the time this suit was filed. It becomes then a question as to the rights of the heirs of Riley Fulsom to convey their interest in the land in question.

In the case of Murrow Indian Orphans' Home v. McClendon, decided by this court and reported in 64 Okla. 205, 166 P. 1101, the facts show that Susan McGee made a deed to the Murrow Indian Orphans' Home on March 3, 1909, and the Murrow Indian Orphans' Home then went into possession of the land. Susan McGee was a full-blood Chickasaw Indian and her restrictions on the alienation of her land had not been removed by operation of law or by the Secretary of the Interior under provision of law. Susan McGee died intestate on January 26, 1912, and her heirs sold the lands in controversy to the defendant in error, McClendon, and his assigns for a consideration of $1,200. On May 27, 1912, the Secretary of the Interior approved the deed given by Susan McGee in 1909 to the Murrow Indian Orphans' Home. It was contended by the Murrow Indian Orphans' Home that they were in possession when the deed was taken from Susan McGee's heirs on February 20, 1912, and that the Murrow Indian Orphans' Home was in adverse possession, and that the deed from Susan McGee's heirs to one Charles Hudson was void as against the defendant, Murrow Indian Orphans' Home.

"Assuming, without deciding, that this is true, then the question presented is: Was the deed from these Indian heirs to Hudson subject to or controlled by our statutes of champerty? Under the authority of Ashton v. Noble et al., 46 Okla. 296, 148 P. 1042, it was not."

After quoting from the Ashton v. Noble Case, the court in the Murrow Indian Orphans' Home Case says:

"Do the statutes of this state, in any way, attempt to regulate or control the terms upon which these restricted lands may be sold, or the conditions under which title to them may pass? No one has title to these restricted lands except the Indian. And his title is by the government so firmly vested in him that even he himself can only divest it with the consent and under the direction of Congress. Congress reserved the right to

control the sales, and prescribe the conditions under which title to these lands might pass. Then how can the state, without the consent of Congress, impose conditions in reference to the passing of these titles? Can a title which is good under the acts of Congress and the rules and regulations of the Department of the Interior be invalidated by a provision in the statutes of Oklahoma? Can these conveyances be burdened with a single provision of our statute, without the consent of Congress? If so, then why can they not be burdened with every provision of our statute with reference to conveyances, and thus the acts of Congress be superseded? We believe that, when the acts of Congress and the regulations of the Department of the Interior say to a purchaser of these lands, 'You have title as against the world,' the statute laws of Oklahoma cannot impose an additional condition, before recognizing the title of that purchaser as against the world. He has the exact kind of title that the acts of Congress contemplated he should have. And Congress has never seen fit to impose our champerty statute upon these restricted lands. Hence it does not apply. But a purchaser having made his purchase in conformity to the acts of Congress and the regulations of the Department of the Interior takes title as against the world."

See, also, the case of Hammet v. Montgomery, 67 Okla. 235, 170 P. 689, by this court.

Let us examine the facts in the case at bar and compare them with the facts in the Murrow Indian Orphans' Home Case as above referred to. There the land belonged to a restricted Indian. The restricted Indian gave a deed in 1909. In 1912 she died. The Murrow Indian Orphans' Home went into possession in 1909, and was in possession at the time the restricted Indian died, and was in possession at the time Hudson took his deed from the heirs of the restricted Indian, their possession having been continuous for three years or more.

In the case at bar no one was in the actual possession of the land in question at the time the Indian died. At the time of the death of the allottee, the land in question was his restricted homestead, and he was not permitted to sell the same, but upon his death the title passed to and became the property of his heirs at law. The defendant claims that he was in possession, and that a deed from the heirs to the plaintiff was void as to the defendant for the reason that he was in adverse possession under a void deed, a deed that had been forged. The deed which had been forged

was just as void as the deed which Susan McGee gave to the Murrow Indian Orphans' Home because she was a full-blood Indian. Can the defendant successfully maintain that the state statute would restrict the heirs of Riley Fulsom from making a deed to the plaintiff in this case, and say that because the defendant was in adverse possession that such deed was void? We think that position cannot be maintained.

The decisions of this court and of the federal courts, holding that the state champerty statute does not apply to deeds of restricted Indians and restricted Indian heirs, are too well-settled to maintain such a position as the defendant relies upon. The plaintiff contends in her brief that the proviso on the statute above quoted prevents the defendant from setting up the fact that plaintiff's deed from the heirs of Riley Fulsom was void. The proviso was not passed by the Oklahoma Legislature until 1919. See 1919 Session Laws, chap. 170, which was approved April 8, 1919, and which would not apply to this case. This had, however, been the rule adopted by this court long before the passage of that proviso and for the reasons stated.

As we see the question involved in this case, the judgment of the trial court can be approved on another theory under the champerty statute. The statute provides that if the grantors have not been in possession or have not taken rents within a year, then a deed is void as to parties in adverse possession. There is no evidence in the record to show who was in possession previous to August 15, 1908, and, under the holdings of the courts, which are well settled, the possession of property follows the legal title, and the title holder is presumed to be in constructive possession and the possession of wild and vacant lands follows the record title. Then, under this rule of law, Riley Fulsom's heirs were in possession of this land on and before the 15th day of August, 1908, and the plaintiff took his deed from the heirs on August 21, 1908, six days after the defendant claims to have gone into possession. Then, how can the defendant maintain that the grantors of the plaintiff had not been in possession within a year from August 15, 1908? On this theory of the case, the plaintiff's title is not void as against the defendant, Eysenbach, and his grantees for the reason that the law presumed that the grantors of the plaintiff were in possession up until the 15th day of August, 1908.

There is no question as to the judgment in this case against Eysenbach on his warranty in favor of the defendant H. A. Jenson, and there is nothing before the court to pass on on that question. It is the opinion of the court that the heirs of Riley Fulsom had a right to convey their interest in the lands described in the plaintiff's petition to the plaintiff, and that the heirs of Riley Fulsom were in constructive possession of the lands in question on August 21, 1908. That the deed conveying the lands from the heirs of Riley Fulsom to the plaintiff was not champertous for the reason that the champerty statutes of the state of Oklahoma do not apply to the conveyances of restricted Indian allottees and their restricted heirs to inherited land, and that the plaintiff was entitled to possession of the land and entitled to have his title quieted against defendants and all persons claiming under the defendants. That the judgment of the trial court should be affirmed.

The Supreme Court acknowledges the aid of Attorneys Charles H. Hudson, James S. Arnote, and Charles R. Freeman in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Hudson, and approved by Mr. Arnote and Mr. Freeman, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.